Filed 5/3/16  P. v. Sehmbey CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> NIRMAL SEHMBEY, <br><br> Defendant and Appellant. | F069142/F069567 <br><br> (Kern Super. Ct. No. BF138901A) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Charles M. Sevilla, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Nirmal Sehmbey (defendant) stands convicted, following a jury trial, of conspiracy to commit robbery (Pen. Code, §§ 182, subd. (a)(1), 212.5, subd. (c); count 1)[1] and conspiracy to commit assault with a deadly weapon or by means of force likely to produce great bodily injury (§§ 182, subd. (a)(1), 245, former subd. (a)(1); count 2). He was acquitted of making criminal threats. (§ 422; count 3.) Defendant was sentenced to a total unstayed term of three years in prison, and ordered to pay restitution and various fees, fines, and assessments.[2] We now hold: (1) The conviction on count 2 must be stricken, as the evidence establishes only one conspiracy; hence, the claim of insufficiency of the evidence as to count 2 is moot; (2) Defendant is not entitled to reversal based on rulings concerning, and/or admission of, the testimony of Jorge Negrete; (3) There was no instructional error; (4) The prosecutor did not commit misconduct; and (5) Defendant is not entitled to reversal based on cumulative prejudice. Accordingly, we modify the judgment and affirm.

## FACTS

### I

#### PROSECUTION EVIDENCE

*The Attack and Investigation*

As of February 2011, Dr. Ravinderjit Singh and her husband, Manjit Singh, had been attending temple at the Sikh Temple on P Street in Bakersfield for a number of years.[3] Manjit acted as a secretary of the temple, a volunteer position that was one of respect. When the couple married in 2003, however, many in Ravinderjit's family

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] Defendant filed a timely notice of appeal following sentencing. A hearing subsequently was held to determine the amount of restitution to be paid. Defendant filed a separate notice of appeal following that hearing. We ordered the appeals consolidated.

[3] For clarity, we refer to the Singhs by their first names. No disrespect is intended. Undesignated dates in the statement of facts are to the year 2011.

disapproved of the marriage. Defendant, who was married to Ravinderjit's aunt, was not happy with the marriage because he perceived Ravinderjit and Manjit as being unequal. Defendant said Manjit did not know who defendant was and how much power he had, and that the couple could not get married. Although Manjit took the words as a threat, he and Ravinderjit married anyway.

After time passed, everything grew quiet. The Singhs had no relationship with defendant, and he left them alone until the summer of 2010, when Ravinderjit's aunt stayed with the couple for a few days. Defendant, who was angry the couple had allowed his wife to stay at their house when she had been kicked out of her home, made threatening telephone calls to the Singhs and said he was going to come and get them. Eventually, the aunt returned to defendant.

Around February 1, a third party telephoned Manjit and connected defendant to the call. Defendant stated he was very upset and asked why Manjit had kept defendant's wife at Manjit's house. Defendant said he had power and money and could do horrible things to Manjit, and that Manjit only had two weeks to live. Manjit called the police the next day and made a report, because defendant kept calling. Manjit declined to pursue legal action against defendant, however.

On February 20, the Singhs attended temple with their two young children. They arrived between 11:00 a.m. and 11:30 a.m. and parked their vehicle in the parking lot. Manjit was driving; Ravinderjit was sitting in the back seat with the children.

Ravinderjit saw two Hispanic males approaching the car from the back. Neither she nor Manjit had ever seen the men before. Ravinderjit saw small guns in their hands. Manjit got out of the car and went to open the back door for his children, and the men immediately attacked him. A fight ensued. Manjit managed to hold one of them down; this man, who was young, tall, and thin, repeatedly struck Manjit in the nose. The other, who was shorter and chubbier, punched Manjit in the head and back. Ravinderjit got out of the car and tried to help Manjit by hitting the men with a large spoon. Ultimately, the

3.

heavier man stopped assaulting Manjit and fled. Manjit held the other man down until the police arrived. Manjit suffered abrasions to his hands and legs, a bloody nose, and a severely injured finger.

Prior to the assault, Manjit was wearing his turban, which he habitually did when attending temple. When he was hit in the head, his turban was removed. After the assault ended and the heavier man fled, the turban was nowhere to be found.[4] Manjit never received it back. The turban had no monetary value, but was "the most valuable for a family." In Sikh culture, the turban is worn as a symbol of respect, pride, and dignity. It is invaluable. To lose one's turban is to lose one's respect. A person removing another's turban would be showing great disrespect. As a result of the attack, members of the congregation saw Manjit without his turban.

On March 3, Kern County Sheriff's Detective Brunsell set up a pretext telephone call between Manjit and defendant.[5] In the conversation, defendant said he was not going to cuss at Manjit over the phone, but would meet him face-to-face, and to get ready. When Manjit called defendant a name and asked what he was going to do, defendant instructed him not to curse at defendant, and said, "You already got the result for cursing." Manjit asked, "What result did I get? What did I get? Your man has been caught." Defendant called Manjit an obscene name, then said, "You got beaten in front of women, in front of all the congregation. In front of children you got beaten." He then asked how much more humiliation Manjit needed. When Manjit said defendant's man had been caught and was in jail, defendant responded that he came out on bail. Manjit asked if defendant got him freed; defendant replied, "What need do I have to get him

---

[4] Ravinderjit told police that during the incident, she saw the heavier man remove the turban from Manjit's head and throw it to the ground.

[5] The call was presented at trial by Satvinder Kaur Franco, a registered interpreter in the Punjabi and Hindi languages. She explained that the two parties spoke over each other. Defendant yelled and seemed agitated.

4.

freed, you sister f[**]ker. Whosever man he is will get him freed. Why do I need to get him freed?" Manjit said the man was caught and named defendant, whereupon defendant demanded to know who said it. After further insults, defendant said, "Listen to me. I will shove a stick up your ass hard. You stop or else." Manjit asked how defendant would do it. Defendant responded, "I say straighten up. Straighten up. Become a man, you idiot. Sister f[**]ker, you will get killed by my hands." Defendant said he had men who would abduct Manjit from Manjit's house. Manjit called defendant a jackal and suggested his men were also jackals. Defendant responded, "That's why the stick went in your ass." When Manjit asked how it went in, defendant answered, "All that humiliation in front of women, men, the whole congregation, all of Bakersfield. You sister f[**]ker, you should die of shame." Manjit said defendant was the one who was humiliated, because everyone said defendant sent men but could not do anything. Defendant responded that he was a millionaire, and if he wanted to fight with Manjit, defendant would send his army, and they would abduct Manjit and bring him.

After further insults, defendant demanded to know why Manjit had kept defendant's "woman" in Manjit's house and told her to get a divorce. The subject then returned to who had been humiliated. Defendant asked, "How else do you understand humiliation? Got beaten in front of women, in front of the whole congregation." He also said, "Where is your turban? The Mexicans took your turban," and told Manjit to go and get it from "those ruffians." Defendant also said, "Blood was flowing from your mouth. Blood was flowing from your nose," and that "the Mexican" kicked Manjit in the face. He did not answer when Manjit asked how he knew. Defendant told Manjit to get his turban, and then Manjit would be worthy to talk to defendant.

A day or two later, defendant telephoned Manjit again. Defendant told Manjit, "[G]et ready. I'm going to get you." Manjit took this as a death threat. It caused him to be afraid, and he contacted the police.

5.

*Jorge Negrete's Testimony*

On February 20, Paul Macias gave Jorge Negrete (Negrete) and Negrete's nephew, Jose Macias, a ride to Bakersfield.[6] Negrete came to Bakersfield to assault someone. He carried out the assault. He did not know his victim. He carried out the assault because he was going to be paid. He received his payment after the assault.

At trial, Negrete professed not to remember some parts of the incident. He testified he did not recognize a photograph of Manjit, although the picture "[p]robably" was the man he assaulted. He did not recall how much he was paid for the assault. He denied seeing anyone in the courtroom who paid him for the assault. When shown a photographic lineup by police on August 29, however, he identified a photograph of defendant.[7] In addition, he identified defendant at the preliminary hearing. Defendant was one of the two people with whom Negrete met.[8]

In February, Negrete was living in Van Nuys. He met with defendant down the street from Negrete's house. Defendant was driving a white BMW.[9] Defendant – who

---

[6] Paul Macias and Jose Macias are not related.

[7] Detective Brunsell conducted this interview with defendant. An audio recording of the interview was played for the jury.

[8] Negrete testified at trial that before he was shown the photo array, he was shown a single photograph of defendant. According to Detective Brunsell, however, he had never shown Negrete a photograph of defendant prior to when he showed him the photographic lineup.

[9] Negrete did not recall subsequently telling police that the license number of defendant's car was 5NXF961. At the preliminary hearing, however, he testified that was the number of the BMW he would see when he met with defendant. At trial, he testified he was being truthful at the preliminary hearing.

Detective Brunsell first interviewed Negrete on June 22, the day Negrete was arrested in connection with this case. Negrete volunteered information about defendant's vehicle. Prior to this time, Brunsell had never seen defendant's vehicle; however, Manjit had told him defendant drove a white BMW, and had given Brunsell the license plate number sometime around February 24. Negrete provided the license plate number, which

had initiated contact with Negrete – asked if Negrete would be willing to go to Bakersfield and scare someone and take that person's turban. Defendant said he would pay Negrete to do it. Although Negrete could not remember the amount he was to be paid, he believed it was $1,000. Defendant was the person with whom Negrete made the deal. Afterward, someone else wearing a turban handed Negrete the money. Defendant was present, but remained inside his vehicle.

Negrete was not familiar with Bakersfield, but was supposed to go to a temple to commit the assault. When he arrived, everybody was wearing a turban. Negrete knew whom he was supposed to assault, because he first met with someone a couple of houses down from the temple. That person pointed out the intended victim. The person gave Negrete something like a bandana to wear on his head.

The victim had just gotten out of his car when Negrete and Jose Macias walked up. They surrounded him. The victim quickly turned toward Jose Macias, whereupon Negrete rushed him and started hitting him. The victim tackled Jose Macias, who went to the ground. Negrete started kicking the victim and trying to get him off Jose Macias, but other people started coming over and helping to stop the attack. Negrete fled with the victim's turban.

Defendant had told Negrete to scare someone. Negrete took it upon himself to assault the victim. Negrete did not remember defendant telling him to take the turban; Negrete did take it, however, and believed he left the location with it.[10] Negrete threw the turban away, because Jose Macias had been caught at the scene, and Paul Macias had already left town. Negrete got rid of the turban at a little market a couple of blocks from

he said he had memorized because he did not trust defendant. The number Negrete provided was 5NXF961. He said the car was a white 2006 BMW.

[10] At the preliminary hearing, Negrete testified he came to Bakersfield at defendant's direction to scare the victim and get his turban from him.

the temple. He took a bus back home. After he was paid for the assault, he paid Paul Macias and Jose Macias, who was out on bail.

Negrete was arrested several months later and brought to Bakersfield, where he spoke with law enforcement officers. He believed he identified the kind of vehicle defendant drove and gave them the license number, although he could not recall with certainty.[11]

At the time he testified, Negrete was in custody in state prison. As of February 2011, he was a heroin addict who used the drug every day, and he also had an alcohol problem. He had previously been in prison for selling cocaine to support his habit, and had been involved, on the street, with a Los Angeles-based Southern Hispanic gang since 1998. He had had a number of run-ins with the law for theft-related crimes, including stealing cars.

Negrete entered into a plea agreement for his role in Manjit's assault. As part of that agreement, he understood he would have to testify against defendant. As part of the case settlement agreement in the present case, Negrete pled to battery causing serious bodily injury – a strike – and understood he would be going to state prison. He did in fact go to state prison. In exchange, he agreed to provide truthful testimony in the prosecution of defendant. He had no other understanding or belief concerning the agreement, although his nephew only getting a year in custody and three years' probation influenced him.

After he committed the assault in Bakersfield, Negrete committed a robbery in Los Angeles County by punching a woman in the face and stealing her purse. He had already gone to prison in the Bakersfield case when he entered into a plea agreement in the robbery case, and he was currently in custody for that robbery. Negrete's Los Angeles

---

[11] The parties stipulated defendant was the registered owner of a 2006 BMW, with California license plate number 5NXF961.

County case was not discussed when his plea agreement was negotiated in the Kern County case.

After Negrete's arrest in the present case, he had a conversation with Detective Brunsell. From the beginning, Brunsell tried to induce Negrete to cooperate. Brunsell said Jose Macias was facing over 20 years, and Negrete should cooperate with them because they were after the "big fish." Negrete believed that if he cooperated, it would help his nephew get less time. Negrete's expectation came true. Negrete also expected to get some credit for his Los Angeles County case, but he received "four years consecutive" in that matter. His total sentence in the two cases was five years.[12]

## II

### DEFENSE EVIDENCE

Private Investigator Bruce Groesbeck (Groesbeck) and defense counsel interviewed Negrete on November 7, 2013, at the Los Angeles County Jail. During the interview, defense counsel asked whether Negrete had any expectations or deals regarding his current case. Negrete said he was awaiting sentencing on his Los Angeles County case, and expected his sentence in that case would run concurrently to his sentence in his Kern County case. Negrete said this expectation was based on what his public defender told him. Negrete also said he had a cousin with the last name of Macias who was arrested in this case, and he was concerned about him. Negrete said it was his understanding that if he (Negrete) would "take the heat" in the Kern County case, the district attorney would be lenient with Macias.

Negrete talked extensively about his state of mind. He said he had been "loaded" on a daily basis from approximately November 2009 through the day of his arrest in this

---

[12] In the present case, Negrete originally was charged with two counts of attempted kidnapping, one count of conspiracy to commit assault with great bodily injury, one count of conspiracy to commit robbery, and two counts of conspiracy to commit kidnapping. Those counts all were dismissed because of the plea agreement.

case. He said he could not recall much about the incident, because it occurred so long ago and he was under the influence of drugs when he gave his previous statements. Negrete said that when he was arrested, he was under the influence PCP and had injected heroin about 20 minutes earlier. Negrete said he was unable to make an identification from the first photographic lineup, which he was shown after he had been in custody for six to 10 days. He was shown another six photographs and made a selection, but the detective told him that he had picked the wrong person. As for his identification of the car, Negrete said he could not identify any car's make or year or model. He stated the detective told him what year the BMW was, and Negrete got the license plate number from a photograph the detective showed him.

Negrete said he was paid a couple of days after his involvement in the case. He said defendant was not the man who paid him.[13] Asked why he identified defendant in court, Negrete said he was just trying to "get it over with."

## DISCUSSION

## I

### MULTIPLE COUNTS OF CONSPIRACY

As previously set out, defendant was convicted, in separate counts, of conspiracy to commit robbery (count 1) and conspiracy to commit assault with a deadly weapon or by means of force likely to produce great bodily injury (count 2). He now contends the conviction on count 2 cannot stand, because there was insufficient evidence of two conspiracies. The Attorney General agrees, as do we.

"[W]here the evidence shows that a group of conspirators agreed to commit a number of different crimes incidental to a single objective, there is only one conspiracy, and convictions for multiple conspiracies cannot be sustained. [Citation.]" (*People v.*

---

[13] Negrete was not asked if defendant was present when he received the money, or if he had made the deal originally with defendant.

10.

*Liu* (1996) 46 Cal.App.4th 1119, 1133; accord, *People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557.) "The test is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy. If so, there is but a single conspiracy. [Citation.]" (*People v. Skelton* (1980) 109 Cal.App.3d 691, 718, disapproved on another ground in *People v. Figueroa* (1986) 41 Cal.3d 714, 731–732; see *Braverman v. United States* (1942) 317 U.S. 49, 53.)

Here, the evidence showed a single agreement with multiple objectives and multiple acts committed in furtherance thereof, as the trial court recognized in staying execution of sentence on count 2 under section 654. Accordingly, the double jeopardy clause of the Fifth Amendment to the United States Constitution, which applies to the states (*People v. Batts* (2003) 30 Cal.4th 660, 678), permits defendant to be convicted of only a single conspiracy (see *Brown v. Ohio* (1977) 432 U.S. 161, 169). The elimination of double punishment by means of section 654 is insufficient to cure the error; rather, one of defendant's two conspiracy convictions must be stricken. (See *People v. Patrick* (1981) 126 Cal.App.3d 952, 965.) Because, at the time Manjit was assaulted and robbed, second degree robbery carried a greater maximum term than did assault with a deadly weapon or by means of force likely to produce great bodily injury (compare § 213, subd. (a)(2) [five years maximum] with § 245, former subd. (a)(1) [four years maximum], we strike the conviction on count 2 (see § 182, subd. (a)).[14]

---

**[14]** Defendant further contends the evidence is insufficient to sustain the conviction on count 2. As he recognizes, however, this claim is now moot. There is but one conspiracy shown by the evidence in this case, and the double jeopardy clause prevents the People from seeking to try defendant again for the single offense. (See *Sanabria v. United States* (1978) 437 U.S. 54, 74; *Brown v. Ohio*, *supra*, 432 U.S. at p. 169; *People v. Batts*, *supra*, 30 Cal.4th at p. 678.) Accordingly, we do not address the issue.

# II

## ISSUES CONCERNING JORGE NEGRETE

Defendant contends he was denied his constitutional rights to confrontation, produce evidence, and a fair trial by certain of the trial court's rulings concerning, and the admission of, Negrete's testimony. We conclude defendant has not shown cause for reversal.

## A. Background

Negrete testified at defendant's preliminary hearing and again at trial, as set out in the statement of facts, *ante*. Prior to his trial testimony, he appeared with attorney Anthony Egbase (Egbase). Negrete stated it was his desire to assert his Fifth Amendment privilege against self-crimination, and that he did not wish to testify in defendant's case because he believed the testimony he gave at the preliminary hearing might violate his right against self-incrimination.

The trial court determined it was Egbase's obligation to establish a legal and factual basis for Negrete's assertion of the privilege. The court afforded Egbase and both parties the opportunity to present evidence on the issue. Egbase represented that Negrete gave a recorded interview to the People's investigator in which he made statements he (Negrete) believed might subject him to further criminal prosecution or investigation, specifically that he admitted having a telephonic communication with defendant, and he believed the communication violated federal and state laws. In addition, Egbase represented that Negrete believed his testimony in the preliminary hearing might subject him to further criminal prosecution, specifically telephonic communications Negrete admitting making to parties. Finally, Negrete made statements to Groesbeck that were in direct contradiction to what he told the People's investigator and to his testimony at the preliminary hearing, and Negrete believed those contradictory statements might subject him to further civil or criminal matters in the future.

The court admitted into evidence copies of the reports and recorded statements referenced by Egbase, and it took judicial notice of the preliminary hearing transcript. At defendant's request, the court also admitted into evidence the reporter's transcript of the sentencing hearing in Negrete's Los Angeles case and the case settlement agreement between Negrete and the district attorney's office in the present (Kern County) case, and it took judicial notice of the reporter's transcript of Negrete's and Macias's changes of plea. At the prosecutor's request, the court admitted into evidence the felony advisement of rights waiver and plea form as it related to Negrete in the Kern County case. The People also presented testimony from Jacob Evans, the attorney who represented Negrete in the Kern County case. In that capacity, Evans participated in the negotiation of a plea agreement and a case settlement agreement in this case. Prior to presenting them to the court, Evans reviewed both of them with Negrete.

At the conclusion of evidence, Egbase argued the exhibits showed Negrete admitted to telephonic conversations with defendant and other witnesses that potentially could subject him to prosecution for federal violations. Egbase also argued there was no immunity given to Negrete regarding testimony he was supposed to give in the present case, should he incriminate himself. Egbase took the position the Los Angeles County judge resentenced Negrete in the Kern County case in the course of imposing sentence in the Los Angeles matter, and, although the Kern County District Attorney's Office was contacted, there was no representation from that office at that time that Negrete had to cooperate in these proceedings. Under those circumstances, Egbase argued, all the terms and conditions of the original Kern County sentence were vacated. Egbase further argued that even if those terms were not vacated, no term of sentence in the Kern County case required Negrete to cooperate, because Negrete did not sign the agreement and stated he had never seen it.

Defense counsel acknowledged he could not assert or recommend invocation of privilege by a witness. As a friend of the court, counsel argued Negrete was now

13.

admitting he previously lied, which could subject him to perjury. Counsel also noted a state prosecutor could not preclude a federal prosecution.

The prosecutor noted that the plea transcript in Negrete's Kern County case referred to additional documentation, although the case settlement agreement was not specifically delineated on the record due to potential security issues for Negrete should it become known he had entered into an agreement that potentially required him to testify against someone. As for possible perjury, the prosecutor noted Negrete's sworn testimony was consistent with statements made to and recorded by law enforcement, whereas statements made to defendant's attorney and investigator were unsworn. The prosecutor acknowledged that if the court viewed the case settlement agreement as a grant of immunity, such a grant did not extend to perjured testimony. The prosecutor did not believe the People had offered perjured testimony, since the overall facts of the case corroborated and supported Negrete's sworn testimony at the preliminary hearing.

The trial court noted one issue was whether Negrete's original statements and preliminary hearing testimony potentially subjected him to prosecution for federal offenses relating to electronic or telephonic communication or for perjury. The court found the potential for federal prosecution "not … problematic," as there was no specific federal law cited to it suggesting Negrete's testimony would tend to establish a violation of any offense other than that for which he was already prosecuted and convicted. The court stated it was unaware of any federal offense for which Negrete could be prosecuted with respect to his actions in this matter. The court additionally observed the preliminary hearing testimony had been given more than two years earlier. The court concluded there was nothing other than a fanciful or imagined basis for federal prosecution based on Negrete giving testimony at trial.

With respect to prosecution at the state level, the court characterized the case settlement agreement as a limited immunity agreement, and so found Negrete no longer had a legal right to claim the privilege against self-incrimination because he was not

14.

subject to prosecution with regard to the issues involved. The court observed Negrete had already been prosecuted and entered a plea in Kern County, and had been sentenced accordingly. It determined the resentencing in Los Angeles County did not change that situation.

The court then turned to the issue whether the terms of Negrete's plea in the Kern County case, and the case settlement agreement, required Negrete to testify or permitted him to raise a self-incrimination privilege in the current case. The court found it "quite clear" Negrete was aware of the fact that when he entered his plea in the Kern County case, he was entering into an agreement that required him to testify truthfully in any subsequent prosecution of defendant. The court acknowledged the case settlement agreement was not signed by Negrete; however, Evans's testimony established it was discussed with Negrete, the case settlement agreement was incorporated by reference in the terms of the plea contained on the waver form, and Negrete testified at the preliminary hearing that he was aware of the terms of the agreement. The court found the agreement was legally valid and not coercive, in that it required Negrete to give truthful testimony. The court determined the agreement constituted a waiver of Negrete's privilege against self-incrimination.

Finally, as to Negrete's claim of liability for potential perjury, the court determined Negrete, having testified once and received the benefit of his agreement, had no legal right to claim his Fifth Amendment privilege and not testify in further proceedings. The court observed it was up to Negrete whether to testify truthfully, but found it inconsistent with the interests of justice to permit him to evade, by asserting the privilege against self-incrimination, the requirements of the agreement into which he entered. The court found no factual basis that created a reasonable possibility of prosecution.

Although the court ruled Negrete could not claim the Fifth Amendment in his testimony and would be required to answer questions, it stated it would take further steps

15.

if any became necessary as Negrete's testimony proceeded. Egbase was permitted to meet with Negrete that day, and was also allowed to stand next to him while he testified.

Negrete's testimony is summarized in the statement of facts, *ante*. During his testimony, he often claimed not to remember various things. At one point during direct examination, he stated defendant was not the person with whom he met prior to coming to Bakersfield. He admitted making an identification when shown a photographic lineup and at the preliminary hearing, however. He also testified at trial that he was being truthful when he testified at the preliminary hearing.

Negrete's rap sheet was admitted into evidence at the prosecutor's request. In addition, the prosecutor questioned Negrete concerning the terms of his plea agreement and the case settlement agreement, which Negrete admitted entering into and an unexecuted copy of which was admitted into evidence. Negrete admitted pleading to a strike and for prison time, that he in fact went to prison, and that he agreed to give truthful testimony in defendant's case. He testified he had no other understanding or belief as it related to the case settlement agreement, but what happened to Jose Macias had some influence on his entering into the agreement. Each of them "cut his deal."

On cross-examination, defense counsel brought out the specific nature of some of Negrete's prior convictions, Negrete's age (29 years old), and the length of his rap sheet (some nine pages). In addition, Negrete testified that from the very beginning, Detective Brunsell tried to induce him to cooperate by telling him Jose Macias was facing over 20 years, showing Negrete "all kinds of stuff," and saying that while he was not making any promises, he was going to go to the district attorney. Negrete agreed with defense counsel that he was "kind of" induced to give a statement in order to help Jose Macias. Negrete believed if he cooperated, it would help Jose Macias get less time, and that expectation came true. In addition, Brunsell said he knew Negrete had a pending robbery case in Los Angeles County, and when Negrete made his deal in Kern County, his expectation was that he would be getting some credit for the Los Angeles case. In reality,

16.

he received "four years consecutive" in Los Angeles County.  They did not give him any credit.  As of the time of trial, Negrete was serving a total of five years.  Originally scheduled to be released on February 17, 2014, he now would not be released until October 13, 2014.

Defense counsel elicited that Negrete testified at the preliminary hearing, and was also in court in relation to this case about two weeks before trial.  When counsel attempted to elicit that Negrete wanted to assert his Fifth Amendment privilege at that time, the prosecutor's relevance objection was sustained.  After a sidebar conference, the trial court reiterated the objection was sustained.[15]  This ensued:

> "Q.  [by defense counsel]  Let's go back to the preliminary hearing, your testimony there.  Did you commit perjury at the preliminary hearing?
>
> "A.  No.
>
> "Q.  You testified truthfully?
>
> "A.  Yes.
>
> "Q.  Just like you're testifying truthfully here today.  Right?

---

[15] During the sidebar conference, defense counsel made an offer of proof that Negrete asserted his Fifth Amendment privilege at the earlier hearing because of concern about incriminating himself for allegedly having committed perjury at the preliminary hearing.  The court explained it sustained the objection, because the jury generally is not entitled to consider the assertion of the privilege as a factor relevant to credibility.  The court told counsel he could inquire into the separate issue whether the testimony given at the preliminary hearing was true.  The court noted that CALCRIM No. 320 normally was given where a privilege was asserted in front of the jury, and instructed jurors to disregard and draw no conclusions from the assertion.  Moreover, case authority held a court generally should not require a privilege to be exercised in the jury's presence.  The court clarified that if Negrete stated under oath that he did not testify truthfully at the preliminary hearing, he could be impeached with that testimony.

Defense counsel argued Negrete's testimony now was being coerced as opposed to being given voluntarily.  The court responded that the assertion of the privilege itself was generally irrelevant to an evaluation of credibility, but counsel could attempt to establish through inquiry that the testimony was being coerced in some fashion.

"A. Yes.

"Q. Your expectation is that if you testify the same way that you testified to at the preliminary hearing that this deal that you entered into with the prosecution would remain in full force and effect? [¶] … [¶]

"A. Yes."

Negrete later admitted telling Detective Brunsell, and testifying at the preliminary hearing, that he did not take Manjit's turban. He did take the turban, however, although he did not take any money from Manjit. Negrete also claimed the preliminary hearing transcript was wrong: It showed he testified he thought the turban was in Paul Macias's car, where Negrete also was. In reality, Paul Macias drove off without Negrete, who then returned to Los Angeles by bus. Negrete also acknowledged the preliminary hearing transcript showed him saying Jose Macias had the turban and threw it in the car when he got caught. Negrete conceded at trial that if he so testified, it would have been a lie, because he was the one who took the turban.

Defense counsel questioned Negrete further about his agreement. Asked if he wanted to keep the deal, Negrete testified he was already doing it, i.e., testifying. He understood that if he broke the agreement, the government might take the deal from him. Defense counsel asked about the meeting Negrete had with counsel and Groesbeck; when counsel asked, "You admitted that you committed perjury at the preliminary hearing, didn't you?" Negrete replied he did not remember saying that. Negrete also said he could not recall saying he could not identify defendant from the photographs. Negrete testified, however, that he truthfully told Groesbeck and counsel that he was shown a single photograph of defendant and then made the identification, and that he truthfully told them he knew nothing about the year of the BMW and knew nothing about cars other than how to steal them.

Negrete testified he did not remember saying he identified defendant in court just to get it over with. Asked if he testified at the preliminary hearing just to get it over with,

18.

Negrete responded, "Well, I had to do what I had to do to get my five years." He agreed he did it to get his deal, "cut [his] nephew some slack," and "to spread a little grease around" Los Angeles to get a deal there, as well. His fear was that if he did not testify the way the prosecution wanted him to testify, they would open the case.

On redirect examination, Negrete testified he knew his interviews with Detective Brunsell were being recorded. As far as Negrete knew, Brunsell never turned off the recorder to show him the single photograph. Negrete admitted telling defense counsel and Groesbeck that defendant was not the person who paid him; however, he did not believe they asked if defendant was present when Negrete got paid. At trial, Negrete explained defendant was not the person who handed him the money, but he was present when Negrete was paid. Defendant was the person with whom Negrete met before the incident at the temple, and who arranged for Negrete to come to Bakersfield and agreed to pay him to commit the crime.

Negrete stated he tried to testify truthfully at trial, but it had been a long time and it was hard to remember everything. He also stated he did his best to testify truthfully at the preliminary hearing. His understanding of the expectation of him what that he would testify truthfully, whatever the truth happened to be.

## A.  Analysis

Defendant contends the trial court erroneously overruled Negrete's assertion of his privilege against self-incrimination. He says Negrete's trial testimony was coerced and unreliable in part as a result, because the court's ruling effectively "locked" Negrete into repeating the incriminatory aspects of his preliminary hearing testimony. Defendant says the trial court further erred by preventing defense counsel from bringing out, on cross-examination, that Negrete unsuccessfully invoked his Fifth Amendment privilege. We conclude no cause for reversal has been shown.[16]

---

[16] Defendant's challenge to the giving of a related jury instruction will be discussed when we discuss defendant's other claim of instructional error, *post*.

19.

The California Supreme Court as set out the basic legal principles as follows:

> "It is a fundamental principle of our law that witnesses may not be compelled to incriminate themselves, and the scope of a witness's privilege is liberally construed. [Citations.] 'To invoke the privilege, a witness need not be guilty of any offense; rather, the privilege is properly invoked whenever the witness's answers "would furnish a link in the chain of evidence needed to prosecute" the witness for a criminal offense.' [Citations.]

> " 'A witness may assert the privilege who has "reasonable cause to apprehend danger from a direct answer." ' [Citation.] Moreover, ' "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." [Citation.] To deny an assertion of the privilege, "the judge must be ' "*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency" to incriminate.' " ' [Citations.] Given the broad protective scope of the privilege, waiver of a nonparty witness's privilege 'is not to be lightly inferred.' [Citations.]" (*People v. Williams* (2008) 43 Cal.4th 584, 613−614.)

" 'It is well established that a witness, in a single proceeding, may not testify

voluntarily about a subject and then invoke the privilege against self-incrimination when

---

The Attorney General says defendant forfeited his claim the trial court erred in finding Negrete lacked any Fifth Amendment privilege, because defendant failed to object to the trial court's ruling in that regard. (See *People v. Seijas* (2005) 36 Cal.4th 291, 301−302.) We disagree. The trial court gave defense counsel, the prosecutor, and Negrete's attorney each the opportunity to present evidence, and to object to evidence proffered by another party. Each was also give the opportunity to argue the issue. Defense counsel correctly acknowledged he could not assert, or recommend invocation of, privilege by or for a witness he did not represent. (See *People v. Ford* (1988) 45 Cal.3d 431, 439−440.) Nevertheless, "as a friend of the court," he argued the statement made by Negrete subsequent to his testimony at the preliminary hearing could expose Negrete to perjury charges. Under the circumstances, the issue was preserved for appeal (see *People v. Abbott* (1956) 47 Cal.2d 362, 372−373), and any objection to the trial court's actual ruling was unnecessary because it would have been futile (*People v. Chism* (2014) 58 Cal.4th 1266, 1291).

20.

questioned about the details. [Citation.] The privilege is waived for the matters to which the witness testifies, and the scope of the "waiver is determined by the scope of relevant cross-examination." [Citation.]' [Citations.] [¶] On the other hand, a witness's failure to invoke the privilege against self-incrimination during one hearing within a proceeding does not necessarily constitute a waiver for the purpose of subsequent hearings. Thus the failure of a witness to claim the privilege at a preliminary hearing does not prevent the witness from refusing to testify regarding the same incriminating material at the trial. [Citations.]" (*People v. Williams*, *supra*, 43 Cal.4th at p. 615.) "A witness, however, may not make a blanket assertion of the privilege against self-incrimination. [Citation.] A witness's 'say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified ….' [Citation.] In other words, a trial court 'must make "a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded." [Citation.] Although the witness may have a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions. The witness may be totally excused only if the court finds that he could "legitimately refuse to answer essentially all relevant questions." [Citation.]' [Citations.]" (*People v. Trujeque* (2015) 61 Cal.4th 227, 267–268.)

The person claiming the privilege against self-incrimination has the burden of showing the proffered evidence might tend to incriminate him or her. (Evid. Code, § 404; see *id*., § 940.) Although, as we have said, the scope of the privilege is to be liberally construed (*People v. Williams*, *supra*, 43 Cal.4th at p. 613), it appears the claimant must prove, by a preponderance of the evidence, the facts necessary to sustain the claim. (See *People v. Mickey* (1991) 54 Cal.3d 612, 655 & authority cited.)

In reviewing the trial court's ruling on a witness's assertion of the privilege, "[w]e review deferentially the trial court's resolution of any factual disputes. [Citation.]" (*People v. Seijas*, *supra*, 36 Cal.4th at p. 304.) The California Supreme Court has

21.

determined that, where the witness was permitted to assert the privilege and the relevant facts are undisputed, an appellate court reviews independently the trial court's ruling permitting the witness to assert the privilege. (*Ibid*.; accord, *People v. Williams*, *supra*, 43 Cal.4th at p. 614.) The Attorney General argues a trial court's *denial* of a witness's assertion of the privilege should be reviewed for abuse of discretion, because, unlike a case in which the witness does not testify, a defendant's confrontation rights are not implicated. We need not decide the issue, because it does not make a difference in this case.

In assessing whether Negrete properly could invoke his privilege against self-incrimination, the question was not whether his testimony actually would have incriminated him, but whether he "had reasonable cause to apprehend *danger* from the testimony. [Citation.]" (*People v. Seijas*, *supra*, 36 Cal.4th at p. 306, italics in original, citing *Hoffman v. United States* (1951) 341 U.S. 479, 486.) In light of the case settlement agreement, it was not reasonable for Negrete to apprehend a danger of self-incrimination from essentially all questions concerning his involvement in events; hence, he was not entitled to a blanket assertion of the privilege such that he did not have to testify at trial. (See § 1324; cf. *People v. Smith* (2007) 40 Cal.4th 483, 520–521.)[17]

The case settlement agreement did not, of course, protect Negrete from possible prosecution for perjury.[18] (See § 1324.) Nevertheless, it affected his legal right to claim

---

[17] Defendant suggests Negrete had reason to apprehend prosecution by federal authorities for conspiracy to violate Manjit's civil rights. (18 U.S.C. § 241.) Even if this is so, however, Negrete's testimony in the case at bench could not be used, either directly or derivatively, in such a prosecution. (*Kastigar v. United States* (1972) 406 U.S. 441, 457–459; *Nelson v. Municipal Court* (1972) 28 Cal.App.3d 889, 891–893; *United States v. Anderson* (9th Cir. 1996) 79 F.3d 1522, 1525–1526.)

[18] The agreement itself was ordered sealed for Negrete's protection, although the trial court permitted its terms to be disclosed and discussed in open court. The unexecuted copy of the agreement admitted into evidence is not included in the record on appeal.

the privilege against self-incrimination, since generally, "where a witness receives immunity, that witness's testimony is compelled and the witness no longer has a privilege against self-incrimination. [Citations.]" (*People v. Morgain* (2009) 177 Cal.App.4th 454, 466–467.)

In *People v. Hathcock* (1971) 17 Cal.App.3d 646 (*Hathcock*), on which the trial court primarily relied, a murder occurred. Sometime later, Hathcock, who was the wife of one of the murder suspects, was granted immunity pursuant to section 1324 from prosecution for any offense arising from the murder. She thereafter gave a written statement to the district attorney implicating her husband in the killing. She also testified for the prosecution at her husband's first trial, which ended in a mistrial. At the second trial, she again testified for the prosecution and implicated her husband; however, when asked if she had truthfully told defense counsel her husband was not involved, Hathcock stated she could not answer the question because she would have a perjury charge if she did. Hathcock ultimately testified she knew her husband had not done it, because he was not there. Based on this last answer, she was prosecuted for, and convicted of, perjury. (*Id.* at p. 648.)

On appeal from the perjury conviction, this court determined Hathcock was subject to prosecution for perjury even though she had been granted immunity under section 1324, as that statute makes an express exception for perjury. (*Hathcock*, *supra*, 17 Cal.App.3d at pp. 648–649. We then stated:

> "The pivotal question … is this: Can a witness who has been granted immunity under section 1324, and who has given testimony at a criminal trial, thereafter successfully assert the privilege against self-incrimination and refuse to answer a relevant question on the ground that the answer might tend to incriminate the witness for the crime of perjury committed at that very trial.
>
> "It is axiomatic that a person who had been called to testify as a witness at a trial, and who has sworn to tell the truth, is morally and legally bound to do so. It follows, by necessary implication, that a witness who

23.

testifies at a trial waives his privilege against self-incrimination as to any question which is thereafter asked to test the credulity of his testimony. A contrary rule could lead to unconscionable results, and in criminal trials could also countervene [*sic*] the defendant's right of confrontation as guaranteed by the Fourteenth Amendment to the United States Constitution; the rule would curtail cross-examination, and the right of cross-examination has been described as the most effective weapon ever devised for the ascertainment of truth. Furthermore, a rule which would permit a witness who has been granted immunity under section 1324, and who has testified, to assert the privilege against self-incrimination in order to refuse to answer a question designed to test the credulity of his testimony would invite treachery as well as perjury.… [T]he purpose of immunity statutes is to secure truthful testimony, not to license perjury.

"The issue presented herein parallels the issue presented when the defendant in a criminal trial voluntarily testifies in his own defense. While a defendant who testifies is still protected by the Fifth Amendment against self-incrimination, he must nevertheless answer all the questions asked by the cross-examiner to explain, clarify or refute any reasonable or logical inference arising from his testimony [citation]. Also, a witness who has derived the benefits of immunity and who has testified must be prepared to answer relevant probative questions." (*Id.* at pp. 649–650.)

We agree with defendant that *Hathcock* does not present the same legal and procedural situation as the present case, because there the witness attempted to invoke her privilege in the same proceeding at which she testified and in which she was ultimately found to have committed perjury. Here, of course, the primary issue was Negrete's testimony at the preliminary hearing. (See *People v. Maxwell* (1979) 94 Cal.App.3d 562, 570–571 & fn. 3.) On the other hand, Negrete was already enjoying the benefits he was afforded under the case settlement agreement. To permit him to thereafter refuse to testify at trial would seem to "lead to unconscionable results" and "invite treachery." (*Hathcock*, *supra*, 17 Cal.App.3d at p. 649.)

24.

We conclude the trial court correctly determined Negrete could not assert a blanket claim of privilege with respect to the entirety of his trial testimony.[19] We cannot tell whether the court would have required Negrete to answer every question, had Negrete attempted to assert the privilege to a specific question or questions, because Negrete never made such an assertion.[20]

The ultimate question we must decide is whether Negrete's trial testimony was coerced and unreliable because (1) he had to "hew to" his preliminary hearing testimony incriminating defendant in order to maintain his deal and avoid exposure to additional custody, and (2) he had to do so without the benefit of asserting his Fifth Amendment privilege. The combination, defendant says, denied defendant his fundamental right to confront the key prosecution witness.

"The defendant has no standing to assert a violation of another's constitutional rights." (*People v. Boyer* (2006) 38 Cal.4th 412, 444.) "A defendant may assert a violation of his or her own right to due process of the law and a fair trial based upon third-party witness coercion, however, if the defendant can establish that *trial* evidence was coerced or rendered unreliable … and that the admission of this evidence would deprive the defendant of a fair trial. [Citations.]" (*People v. Williams* (2010) 49 Cal.4th

---

[19] That the trial court's reasoning may have differed from ours is of no import. (See, e.g., *People v. Chism*, *supra*, 58 Cal.4th at p. 1307, fn. 13; *People v. Mickey*, *supra*, 54 Cal.3d at p. 655.)

[20] The court's remarks in this regard are ambiguous. It stated: "So the Court will rule at this point in time that Mr. Negrete may not claim the Fifth Amendment in his testimony. He will be permitted to be called, and he will be required to answer questions. *We'll see how that proceeds, and if it is necessary to take any further steps, those steps will be taken in the appropriate way and the appropriate time*, but all of that is premature, and I will not discuss it at this point in time since there is no need to do so in order to resolve the issues before the Court today." (Italics added.) We cannot tell whether the court was contemplating that Negrete might assert the privilege as to specific questions, and whether it would revisit its ruling on a question-by-question basis, or whether it anticipated possibly having to take further steps, such as a finding of contempt, to compel Negrete's testimony.

25.

405, 452–453.)  Defendant bears the burden of showing how the coercion " 'directly impaired the free and voluntary nature of the … testimony in the trial itself' [citation] and impaired the reliability of the trial testimony [citation]."  (*Id*. at p. 453, fn. omitted.)[21] "On appeal, we independently review the entire record to determine whether a witness's testimony was coerced, so as to render the defendant's trial unfair.  [Citation.]"  (*People v. Boyer*, *supra*, 38 Cal.4th at p. 444.)

The California Supreme Court has stated "[t]here is nothing improperly coercive about confronting a lesser participant in a crime with his or her predicament, and offering immunity from prosecution for the witness's criminal role in return for the witness's promise to testify fully and fairly.  [Citations.]"  (*People v. Boyer*, *supra*, 38 Cal.4th at p. 445.)  Nevertheless, " '[a] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion.'  [Citation.]  Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement give to police [citation], or that his testimony result in the defendant's conviction [citation], the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies the defendant a fair trial.  On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an

---

[21] Defendant cites *People v. Pokovich* (2006) 39 Cal.4th 1240, 1248 for the proposition that "compelled statements may not be used by the prosecution for any purpose.  [Citation.]"  However, the issue in *Pokovich* was whether a *defendant's* trial testimony could be impeached with statements the *defendant* made to mental health professionals during a court-ordered competency examination.  (*Id*. at p. 1240.)  The issue in *New Jersey v. Portash* (1979) 440 U.S. 450, 459, which *Pokovich* cited as authority for the proposition, was whether a *defendant's* grand jury testimony, give after the defendant was granted use immunity, could be used to impeach the *defendant's* own testimony at his or her later criminal trial.  (*Portash*, at p. 451.)  Although we do not quarrel with the general proposition, it is clear the matter is not quite so cut-and-dried where a third-party witness's testimony is concerned.

26.

agreement requiring only that the witness testify fully and truthfully is valid. [Citations.]" (*People v. Allen* (1986) 42 Cal.3d 1222, 1251–1252, fn. omitted.) This is so even when the prosecutor believes a particular account is truthful, and might take the position, if the witness deviated materially from it, that the bargain had been breached and the witness could be prosecuted. (See *People v. Fields* (1983) 35 Cal.3d 329, 361.)

Nothing in the record of the present case suggests Negrete's case settlement agreement was, in itself, coercive, and the trial court found it was not. Negrete's beliefs and expectations concerning the agreement and what it required of him were thoroughly explored at trial. (See *People v. DeSantis* (1992) 2 Cal.4th 1198, 1219–1220.)

Significantly, and contrary to defendant's argument, the record does not support the conclusion Negrete felt he had to "hew" to his preliminary hearing testimony and was "locked in" to incriminating defendant. Indeed, Negrete's trial testimony differed from his testimony at the preliminary hearing in a number of material ways that were explored at length before the jury. (See, e.g., *People v. Homick* (2012) 55 Cal.4th 816, 863 & fn. 29; *People v. Avila* (2006) 38 Cal.4th 491, 595; *People v. Badgett* (1995) 10 Cal.4th 330, 362.) "The jury had every opportunity to discount or entirely disbelieve [Negrete]'s testimony – an opportunity enhanced by the court's instructions that [Negrete] was an accomplice as a matter of law and that an accomplice's testimony is to be [viewed with caution]. The jury chose to believe [Negrete] and not defendant despite the examination and instructions." (*People v. DeSantis*, *supra*, 2 Cal.4th at p. 1220, fn. omitted.) Negrete's case settlement agreement, his prior statements and testimony, and his prior criminal record – which was also placed in full before the jury – went to the weight of his testimony, not its admissibility. (See *United States v. Kimble* (5th Cir. 1983) 719 F.2d 1253, 1256–1257.) Defendant suffered no violation or diminution of his fair trial or other constitutional rights.

It is true the trial court sustained the prosecutor's relevance objection when defense counsel asked Negrete if, when Negrete was in court two weeks earlier, he had

wanted to assert his Fifth Amendment privilege.  A trial court has broad discretion in determining the relevance of evidence, and we review its rulings on the admissibility of evidence for abuse of that discretion.  (*People v. Richardson* (2008) 43 Cal.4th 959, 1001; *People v. Waidla* (2000) 22 Cal.4th 690, 724.)  We find no abuse here.

The California Supreme Court has stated:  "No inference may properly be drawn from the invocation of a privilege.  [Citation.]  Allowing a witness to be put on the stand to have the witness exercise the privilege before the jury would only invite the jury to make an improper inference.  [Citations.]"  (*People v. Frierson* (1991) 53 Cal.3d 730, 743; accord, *People v. Smith* (2007) 40 Cal.4th 483, 516–517.)  In the present case, Negrete sought to assert his privilege against self-incrimination so as completely to avoid testifying at trial.  As we discussed, *ante*, even assuming he could properly have asserted the privilege in response to particular individual questions, he had no right to assert a blanket privilege.  Thus, permitting him to be asked if he had wanted to assert his privilege either would have invited jurors to draw an improper inference, or would have required Negrete to incriminate himself by explaining why he sought to assert the privilege in the first place.

Where a witness has no constitutional or statutory right to refuse to testify, " '[j]urors are *entitled* to draw a negative inference *when such a witness refuses to provide relevant testimony*.'  [Citation.]"  (*People v. Morgain*, *supra*, 177 Cal.App.4th at p. 466, first italics in original, second italics added.)  Here, of course, Negrete testified and was fully cross-examined.[22]

The trial court did not err in sustaining the objection.  Nor did its ruling deprive defendant of his constitutional rights to due process, confrontation, and to present evidence.  "[A]pplication of the ordinary rules of evidence under state law do not violate

---

[22] The present case thus is materially distinguishable from *People v. Garner* (1989) 207 Cal.App.3d 935, on which defendant relies.

a criminal defendant's federal constitutional right to present a defense ….." (*People v. Abilez* (2007) 41 Cal.4th 472, 503.) Moreover, a defendant's rights to due process and to present evidence do not include the right to present the jury speculative inferences based upon a witness's invocation of the privilege against self-incrimination. (*People v. Williams*, *supra*, 43 Cal.4th at p. 630, fn. 27.) Defendant's trial was not rendered fundamentally unfair (see *People v. Hunt* (2011) 196 Cal.App.4th 811, 817); defendant was given full rein to test Negrete's credibility (cf. *Chambers v. Mississippi* (1973) 410 U.S. 284, 295), and, in light of this fact, his confrontation rights were not violated because the prohibited cross-examination would not have produced a significantly different impression of Negrete's credibility (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680; see *People v. Williams* (1997) 16 Cal.4th 153, 207–208; *People v. Mickle* (1991) 54 Cal.3d 140, 168–169; *In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1385–1386).

## III

### ALLEGED INSTRUCTIONAL ERROR

A.    **CALCRIM No. 337**

At the outset of his testimony, Negrete informed the jury he currently was in custody in state prison. Later, the prosecutor requested that the court give CALCRIM No. 337, which the prosecutor had modified to read: "When Jorge Negrete testified, he was in custody. The fact that a witness is in custody does not by itself make a witness more or less believable. Evaluate the witness's testimony according to the instructions I have given you." Defense counsel objected "out of an abundance of caution because when you are a government informant or cooperating witness and you're in custody, the expectations of your custodial treatment affect your testimony. And so the fact of being in custody is another element of coercion for testifying consistently with what the prosecution wants.… In this case … the custodial status is an element of credibility." The trial court overruled the objection and gave the instruction as requested.

Defendant now says the trial court erred. He claims the fact Negrete was in custody was indeed relevant to Negrete's credibility, because Negrete was testifying "to make sure he limited his custodial status by maintaining his plea agreement," and so he could not afford to admit committing perjury by contradicting his preliminary hearing testimony.

"In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' [Citations.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 831.) In other words, we cannot − as defendant has done − view a single instruction "in 'artificial isolation'; instead, it must be evaluated 'in the context of the overall charge.' [Citations.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 823−824.) We also consider counsels' arguments in assessing the probable impact of the instruction on the jury (*People v. Young* (2005) 34 Cal.4th 1149, 1202), and we assume jurors are intelligent persons capable of understanding and correlating all of the instructions given (*People v. Mills* (1991) 1 Cal.App.4th 898, 918).

As given in this case, CALCRIM No. 337 did *not* tell jurors they could not consider the fact Negrete was in custody.[23] Jurors were well aware of his custodial status, and were not told they could not discuss that fact or the effect his underlying crimes and plea agreement might have on their assessment of his credibility. (See *People v. Mackey* (2015) 233 Cal.App.4th 32, 114.) "CALCRIM No. 337 expressly limits its

---

[23] The unmodified version of CALCRIM No. 337 contains a paragraph instructing jurors to "completely disregard" and " not consider … for any purpose" the fact a witness was physically restrained while testifying. Citing *People v. Duran* (1976) 16 Cal.3d 282, 291−292, the Bench Note advises that the trial court has a sua sponte duty to give the instruction of a witness was physically restrained in a manner visible to the jury. There is no indication in the record Negrete was so restrained.

application to the jury's consideration of the custodial *status* of a witness, without reference to the *conduct* underlying the custody." (*Id*. at p. 115, italics in original.)

Moreover, the instruction specifically directed jurors to the other instructions they were given with respect to evaluating credibility. For example, they were told:

> "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of the testimony. Among the facts that you may consider are: [¶] … [¶]

> "Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided; [¶] … [¶]

> "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony; [¶] … [¶]

> "Did the witness admit to being untruthful;

> "Has the witness been convicted of a felony;

> "Has the witness engaged in other conduct that reflects on his or her believability;

> "Was the witness promised immunity or leniency for his or her testimony.

In addition, jurors were told Negrete was an accomplice, they could not convict defendant based on the statement or testimony of an accomplice alone, and any statement or testimony of an accomplice that tended to incriminate defendant was to be viewed with caution. Both counsel addressed his credibility at length in their summations, with defense counsel expressly arguing the plea bargain induced Negrete to cooperate.

In light of the whole charge, the many reasons to doubt Negrete's credibility, and counsel's arguments on the subject, "we think it inconceivable the jury would have failed to view his testimony with caution or would have failed to consider the reasons underlying his custody status when evaluating his credibility." (*People v. Mackey*, *supra*,

31.

233 Cal.App.4th at p. 116.)  Accordingly, we reject the claim of instructional error.  (See *People v. Jablonski*, *supra*, 37 Cal.4th at p. 832.)

## B.    CALCRIM No. 359

Without objection, the trial court instructed, pursuant to CALCRIM No. 359:

> "The defendant may not be convicted of any crime based on his out-of-court statements alone.  You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime or a lesser included offense was committed.  That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

> "The identity of the person who committed the crime may be proved by the defendant's statements alone.

> "You may not convict a defendant unless the People have proved his guilt beyond a reasonable doubt."

Defendant now contends the instruction is erroneous.  He says it allowed a conviction based on his statements in the pretext call as proof he committed the charged crimes.  We disagree.[24]

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself – i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause."  (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169.)  The prosecution must establish the corpus delicti independent from the admissions of the defendant, thus assuring the accused does not admit to a crime that did not occur.  (*Id*. at p. 1169.)  "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible.  [Citations.]  There is no requirement of

_____

[24] We reject the Attorney General's assertion defendant forfeited his claim by failing to object to the instruction at trial.  Defendant is claiming the instruction was erroneous, not merely that the trial court should have clarified or amplified portions.  Thus, his claim is reviewable under section 1259.  (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.)

independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.]' (*Id*. at p. 1171.) "[O]nce the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues. [Citations.]" (*Ibid*.)

"[T]he corpus delicti rule does not require independent proof that the defendant is the perpetrator of the crime. [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) Thus, identity may be established by the defendant's words alone. (*People v. Frye* (1998) 18 Cal.4th 894, 960, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

When an accused's extrajudicial statements form part of the prosecution's evidence, the trial court has a sua sponte duty to instruct "that a finding of guilt cannot be predicated on the statements alone. [Citations.]" (*People v. Alvarez*, *supra*, 27 Cal.4th at p. 1170; *People v. Najera* (2008) 43 Cal.4th 1132, 1137.) The corpus delicti rule is set out in CALCRIM No. 359 and its counterpart, CALJIC No. 2.72. (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258–1269.)

As explained above, the court in this case gave the pattern instruction of CALCRIM No. 359. Relying on *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*), defendant argues the paragraph of CALCRIM No. 359 regarding the perpetrator's identity allows a conviction based on the defendant's statements alone. We disagree with *Rivas*'s holding on this point.

*Rivas* concluded the initial portion of CALCRIM No. 359 correctly states the corpus delicti rule. (*Rivas*, *supra*, 214 Cal.App.4th at p. 1428.) It then held, however, that the instruction is confusing because of the paragraph about the declarant's identity: "[T]he reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime – and yet those

33.

statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALCRIM No. 359, 3d par.), which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party. The instruction requires reconsideration." (*Id.* at p. 1429, fn. omitted.)

*Rivas* acknowledged that at page 1345 of *People v. Foster* (2010) 50 Cal.4th 1301, the California Supreme Court upheld the corpus delicti instruction as set out in CALJIC No. 2.72. (*Rivas*, *supra*, 214 Cal.App.4th at p. 1429, fn. 8.) *Rivas* distinguished *Foster* on the ground the wording of CALJIC No. 2.72 was quite different than that of CALCRIM No. 359; CALJIC No. 2.72 satisfactorily explained the rule of identity, i.e., that identity is not an element of the crime, whereas CALCRIM No. 359 did not. (*Rivas*, at p. 1429, fn. 8.)[25]

We disagree with *Rivas* and believe the better view is expressed in *People Rosales*, *supra*, 222 Cal.App.4th 1254. That opinion also disagreed with *Rivas*, explaining:

> "It is … well established that a defendant's inculpatory out-of-court statements *may* … be relied upon to establish his or her identity as the perpetrator of a crime. [Citations.] This is because the perpetrator's identity is not part of the corpus delicti. [Citations.]
>
> "CALCRIM No. 359, like CALJIC No. 2.72, clearly so states. The corpus delicti rule is stated in the first two paragraphs of CALCRIM No. 359. The law concerning proof of identity by a defendant's extrajudicial statements is correctly stated in the third paragraph.[26] There is no danger a jury will be unable to separate the two rules any more than in

---

[25] CALJIC No. 2.72 provides: "No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any [confession] [or] [admission] made by [him] [her] outside of this trial. [¶] The identity of the person who is alleged to have committed a crime is not an element of the crime [nor is the degree of the crime]. The identity [or degree of the crime] may be established by [a] [an] [confession] [or] [admission]."

[26] The reporter's transcript in the present case combined the first two paragraphs of the standard instruction.

34.

CALJIC No. 2.72 which has been approved by our Supreme Court in *Foster*. As noted, CALJIC No. 2.72 states in part: 'The identity of the person who is alleged to have committed a crime is not an element of the crime [nor is the degree of the crime]. The identity [or degree of the crime] may be established by [a] [an] [confession] [or] [admission].' CALCRIM No. 359 states with greater precision and economy of language, 'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' CALCRIM No. 359 correctly states the law. [Citations.] There was no reasonable likelihood the jury was confused and misapplied the instruction. Finally, CALCRIM No. 359 reminds the jury that the accused may not be convicted unless the prosecution proves guilt beyond a reasonable doubt. CALCRIM No. 2.72, which was approved by our Supreme Court in *Foster*, contains no such reminder." (*People v. Rosales*, *supra*, 222 Cal.App.4th at pp. 1260–1261.)

We agree with *People v. Rosales*'s analysis of the corpus delicti rule and CALCRIM No. 379, and similarly conclude the instruction was not confusing and did not mislead the jury.[27]

---

[27] We note it is axiomatic that in a criminal trial, the prosecution bears the burden of proving every element of the charged offense beyond a reasonable doubt. (*Middleton v. McNeil* (2004) 541 U.S. 433, 437; *Francis v. Franklin* (1985) 471 U.S. 307, 313.) The prosecution also must prove, again beyond a reasonable doubt, that defendant committed the offense. (*People v. Foster*, *supra*, 50 Cal.4th at p. 1345.) The corpus delicti rule itself, however, is "mandated by no statute, and [has] never [been] deemed a constitutional guaranty …." (*Alvarez*, *supra*, 27 Cal.4th at p. 1169.) Rather, "[t]he corpus delicti rule was established by the courts to 'protect a defendant from the possibility of fabricated testimony out of which might be wrongfully established both the crime and its perpetrator.' [Citations.] The corpus delicti rule arose from a judicial concern that false confessions would lead to unjust convictions. [Citation.] Today's judicial retention of the rule reflects the continued fear that confessions may be the result of either improper police activity or the mental instability of the accused, and the recognition that juries are likely to accept confessions uncritically. [Citation.]" (*Jones v. Superior Court* (1979) 96 Cal.App.3d 390, 397; see *People v. Jennings* (1991) 53 Cal.3d 334, 368.)

# IV

## ALLEGED PROSECUTORIAL MISCONDUCT

As described in the statement of facts, *ante*, defendant made statements, during the law enforcement-instigated telephone call with Manjit, about "the Mexicans" taking Manjit's turban, beating him in front of people, and the like. During his summation, the prosecutor discussed the telephone call. In pertinent part, he told jurors:

> "Throughout the entire thing he's mocking him, talking about the Mexicans coming and bringing the wedding procession, insulting him. 'Where's your turban? If you're a man, you'll get your turban.'

> "By the way, there's no evidence that anybody ever had a conversation with Nirmal Sehmbey describing the events. How did he know they were Mexicans that did this? How did he know the turban was taken? How did he know Manjit didn't have his turban anymore? There's no evidence. To suggest anything else would be pure speculation, and you're not allow to speculate. You base it on the evidence."

A short time later, defense counsel objected. Outside the jury's presence, he asserted the prosecutor committed error under *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*) by arguing the defense did not introduce evidence to explain defendant's apparent knowledge. Counsel claimed the comments implicated defendant's constitutional right not to testify, and shifted the burden of proof to the defense to explain away the prosecution's "spin" on the evidence. Counsel asked the court to instruct the jury to disregard the prosecutor's remarks and to clarify defendant bore no burden or obligation to produce evidence in response to the People's allegations. The prosecutor asserted the comment was "absolutely appropriate," as a number of sources – not just defendant – could have produced the information the prosecutor had suggested could have been produced. The prosecutor noted he had not suggested defendant could have testified, and argued the defense could have called witnesses to explain how defendant obtained his knowledge. The court found the challenged comment was not improper

under *Griffin*. Accordingly, it court overruled the defense objection and declined to admonish the jury.

Defendant now contends the prosecutor committed error under *Griffin*, and the error warrants reversal. We conclude the challenged comments were proper.

"In *Griffin*[, *supra*,] 380 U.S. 609, the United States Supreme Court held that the prosecution may not comment upon a defendant's failure to testify in his or her own behalf. Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses. [Citations.] Nonetheless, … [the California Supreme Court has] held that a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand. [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339, italics in original.)

"We evaluate claims of *Griffin* error by inquiring whether there is 'a reasonable likelihood that any of the [prosecutor's] comments could have been understood, within its context, to refer to defendant's failure to testify.' [Citation.]" (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1523; see *People v. Clair* (1992) 2 Cal.4th 629, 663.) As with any claim a prosecutor's comments constituted misconduct, we " 'do not lightly infer' " the prosecutor intended his or her remarks " 'to have their most damaging meaning, or that they jury would draw that meaning from the other, less damaging interpretations available.' [Citations.]" (*People v. Young*, *supra*, 34 Cal.4th at p. 1192.)

Applying the foregoing standards, we readily conclude the prosecutor did not commit *Griffin* error. His comments clearly went to the state of the evidence, and, as he and the trial court noted, a number of sources could have produced the referenced information. (See, e.g., *People v. Thomas* (2012) 54 Cal.4th 908, 945 [" '[n]ot one person came forward' to say defendant 'couldn't have done it, he was with me' " not

*Griffin* error; the prosecutor's comments were framed in terms of failure to call someone other than the defendant who would testify defendant was with him or her]; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1333 [the prosecutor's review of evidence, followed by comment it was not contradicted by any other evidence, was not comment on the defendant's failure to testify]; *People v. Brady* (2010) 50 Cal.4th 547, 565−566 [the prosecutor did not commit *Griffin* error by arguing the defendant " 'did not appear to refute the issue of identity,' " then noting that other than questioning the witnesses presented, there was no evidence presented to suggest someone other than the defendant committed crime; if the defendant had evidence relevant to identity of victim's killer, the defendant could have presented it in numerous ways without testifying]; *People v. Taylor* (2010) 48 Cal.4th 574, 633−634 [no *Griffin* error where the prosecutor asked who took witness stand and gave reasonable explanation concerning the defendant's presence at victim's home; in context, the prosecutor's query was proper comment on evidence against the defendant, not implicit suggestion defendant should or could have provided nonfelonious reason for entry into victim's home]; *People v. Cornwell* (2005) 37 Cal.4th 50, 90−91 [the prosecutor's comments that defense did not produce evidence to explain why car the defendant had borrowed was parked near scene of homicide at or near time of crime, constituted proper comment on failure of the defense to call witnesses who might logically explain vehicle's presence], disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; *People v. Bradford*, *supra*, 15 Cal.4th at pp. 1339−1340 [no *Griffin* error where the prosecutor's comments amounted to notation of absence of evidence contradicting that produced by prosecution and failure of the defense to introduce material evidence or alibi witnesses; the prosecutor did not allude to lack of refutation or denial by sole remaining witness (the defendant), but rather to lack of evidence, which could have been presented in form of testimony from someone other than the defendant]; *People v. Medina* (1995) 11 Cal.4th 694, 755−756 [the prosecutor

argued several times that defense counsel failed to explain certain evidence; in context, remarks were fair comment on state of evidence].)

When the prosecutor's remarks are considered in context, there is no reasonable likelihood they could have been understood as referring to defendant's failure to testify.[28] The cases on which defendant relies do not persuade us otherwise, because the challenged remarks were considerably different and/or the reviewing court did not assess the comments under the "reasonable likelihood" standard that now applies. (See, e.g., *People v. Vargas* (1973) 9 Cal.3d 470, 476–477 [it was "possible" prosecutor only intended to comment on state of evidence, but remarks were "sufficiently ambiguous" to lead to conclusion *Griffin* error occurred]; *People v. Williams* (1971) 22 Cal.App.3d 34, 43–44 [*Griffin* error found where the prosecutor stated the victim could not be brought back and asked if he knew why he was killed, but it was possible there was only one person who knew, and that was the defendant]; *People v. Crawford* (1967) 253 Cal.App.2d 524, 535 [" '[T]he only thing we have heard from the defendant is this roundabout story from these relatives' " constituted indirect comment on the defendant's failure to testify, in violation of *Griffin*]; *United States v. Cox* (1st Cir. 1985) 752 F.2d 741, 745 [*Griffin* error found where prosecutor repeatedly asked jury to consider how the defendant explained certain evidence; while jury "might" have interpreted comments as referring only to evidence defense actually presented, jury "might" also have taken them as pointing out the defendant failed to explain certain things because she chose not to testify].)

---

[28] Defendant questions the legitimacy of the prosecutor's "how did he know?" argument, if indeed there were sources of the knowledge other than defendant. In light of the evidence Manjit was accosted in the presence of a number of people in the temple parking lot, and the familial relationship that existed between defendant and Manjit, we do not find the argument troubling or of questionable propriety.

# V

## CUMULATIVE PREJUDICE

Last, defendant argues the combined effect of the asserted errors was prejudicial, but we disagree. "There was little, if any, error to accumulate. Defendant received a fair trial." (*People v. Horning* (2004) 34 Cal.4th 871, 913.)

## DISPOSITION

The conviction on count 2, conspiracy to commit assault with a deadly weapon or by means of force likely to produce great bodily injury, is stricken. As so modified, the judgment is affirmed. The trial court is directed to cause to be prepared an amended abstract of judgment showing said modification, and to transmit certified copies of same to the appropriate authorities.

_____
POOCHIGIAN, J.

WE CONCUR:

_____
KANE, Acting P.J.

_____
FRANSON, J.